## Marsh, Adm'r, etc., v. Prentiss et al.

1. *Action for Money Had and Received, etc.*—An action for money had and received under the common counts, can not be sustained without proof that the defendant received the money for the use of the plaintiff, and that a formal demand for the same was made before the commencement of the suit..

2. *Gifts Causa Mortis and Inter Vivos.*—There are two kinds of gifts: 1, gifts simply so called, or gifts *inter vivos*, as they were distinguished in the civil law; and 2, gifts *causa mortis*, or those made in apprehension of death. An instruction stating that if a person, when sick and not expecting to get well, give money to another, and afterward recover from his sickness and repossess himself of the money, defines a gift *causa mortis*.

3. *Gifts Inter Vivos.*—Where an aged wife took a package of money from a book-case and gave or delivered it to her husband, saying that she was getting in poor health and did not expect to live very long, that she wanted him to take it, and at her death bury her, pay the funeral expenses and the balance was his, it was held to be a gift *inter vivos*.

**Memorandum.**—Action of assumpsit, common counts. Appeal from the Circuit Court of McDonough County; the Hon. WILLIAM MARSH, Circuit Judge, presiding. Heard in this court at the May term, A. D. 1891, and affirmed. Opinion filed December 2, 1892.

The opinion states the case.

### APPELLANT'S BRIEF.

A gift *mortis causa* has been clearly defined by this court. Barnet v. The People, 25 Ill. App. 136; Jayne v. Murphy, 31 Ill. App. 28.

One of the indispensable requisites of a gift *mortis causa*, is, that the death of the donee must ensue without any perfect remission of the apprehended peril. The doctrine is elementary, that in case the donee recovers from the illness or survives the peril, the gift not only becomes void, but the donee may recover the subject-matter of the gift. Grymes v. Home, 49 N. Y. 21; Wetson v. Hight, 17 Me. 287; Jones v. Selby, .Prec. Ch. 300; Merchant v. Merchant, 2 Bradf. (N. Y.) 432; Bunn v. Markham, 7 Taunt. 230.

"A party is not required to demand performance of him

Marsh v. Prentiss.

who has already expressly refused to perform his obliga-
tions, for *lex neminem cogit ad vana.*" Abels v. Gover, 15
La. Ann. 247.

" When the debtor notifies the creditor that he will not
pay a debt due him, the law does not require the latter to go
through the vain form of demanding the debt before bring-
ing an action to recover it." Taylor v. Hodges, 105 N. C.
304; 11 S. E. Rep. 136. " The legitimate object of a de-
mand is to enable the party to perform his contract or dis-
charge his liability, agreeably to the nature of it, without a
suit at law, and whenever one party wholly denies the right
of the other, a demand must be useless." Heard v. Lodge,
20 Pick. (Mass.) 53. " The reason for giving notice and the
necessity of it cease when from the facts of the case it is
apparent that the party to be charged had no right to expect,
and can not have been injured by want of it." Randon v.
Barton, 4 Tex. 289.

" In relation to notice, the rule is, that whenever the fact
upon which the defendant's liability is incurred lies peculiarly
within the knowledge and privity of the plaintiff, notice
thereof must be stated to have been given to the defendant.
But where the matter lies as much within the cognizance of
one party as the other, notice is not necessary." Watson v.
Walker, 23 N. H. 471. The principle announced in the above
quotations is stated in the replevin cases of Bowman v. Bart-
lett et al., 29 Wis. 22, and Gottlieb v. Harman, 3 Colo. 53. A
demand in the case at bar, would, in the language of the court
in Lent v. Paddleford, 10 Mass. 230, have been a fruitless cer-
emony. The fact that plaintiff had, prior to bringing this
suit, commenced citation proceedings for the same cause
of action, would be both notice and demand if they were
required in this case. Linn v. McClelland, 4 Dev. and B.
(N. C.) 458; Nixon v. Long, 11 Ired. (N. C.) 428; Badger v.
Batavia Mfg. Co., 70 Ill. 302.

AGNEW & VOSE, attorneys for appellant.

T. J. SPARKS, B. PONTIOUS and PRENTISS & BAILY, attor-
neys for appellees.

OPINION OF THE COURT, *the Hon. George W. Pleasants, Judge.*

Assumpsit, on common counts, against appellees. Trial by jury on the general issue, and verdict for defendants. New trial denied, and judgment entered on the verdict, from which plaintiff appealed.

Decedent was the mother of appellant, by her first husband. In 1860 she married Cornelius Ades, with whom she lived, first on the home farm of her deceased husband, for five years, then at Prairie City for about ten years, then in Iowa for five years, and then in Kansas until the summer or early in the fall of 1888, when they returned to the home farm, then owned and occupied by appellant, where she died on the 27th of October of that year.

It appears that for ten or more years before they returned from Kansas, Mrs. Ades had had the care of a sum of money amounting to about $1,700, which had been kept in packages bound with paste-board. After their return Mr. Ades let appellant have $200 before her death, and $500 shortly after it. Appellant claimed that all of the money in these packages belonged exclusively to his mother until and at the time of her death. Mr. Ades claimed it belonged to him and her alike, being the aggregate of their joint and several earnings, and for their joint and common use, until some time in the year 1887, and that she then gave him all her interest in it and delivered the packages to him. On the 29th of January 1889, appellant took out letters of administration upon her estate, and caused a citation to be issued from the County Court to Mr. Ades, to account for and pay over and deliver to him, as administrator, this money and some other effects claimed to belong to the estate. At the hearing on the citation Mr. Ades produced a large pocket book containing what he said was the money that had been in the packages, less the amount he had let appellant have, and testified fully in relation to it. From the order made on that hearing both appellant and Mr. Ades appealed. The pocket book was opened and the money therein counted by the county judge. It amounted to $935. Appellees, who were the attorneys

Marsh v. Prentiss.

for Mr. Ades, signed his appeal bond as sureties, in considera-
tion of which and for their security the money was delivered
to them by the judge, with the consent of all parties.   Be-
fore the hearing on the appeal Mr. Ades died.   The record
shows that at the May term, 1890, to which it was taken,
his death was suggested, Hiram Harris, who had been
appointed his administrator, substituted as defendant, his
appearance entered, and the cause tried by the court without
a jury, by consent; and that at the close of the trial and after
argument by counsel, the judge announced his finding and
decision against the plaintiff and in favor of the defendant;
but before it was entered on the docket or made of record
one of the attorneys for the plaintiff asked leave for him to
dismiss his suit and announced that he did dismiss it; to
which the defendant by his attorneys objected and asked
for a final judgment in his favor, but the court granted the
leave and made the order dismissing the case at the cost of
plaintiff, to be paid in due course of administration.   And
thereupon (immediately, as we understand,) the *præcipe* for
the summons in this case was filed.

The suit was commenced, according to their testimony,
without any previous formal demand upon defendants.   It
is said, however, that they knew plaintiff claimed the money
and that one of them was told by his attorney that suit
would be brought against them, and replied that it would be
some time before he would get it, substantially; that they
would not pay it to him until compelled by law; that this
was a sufficient demand and refusal, or, that under these cir-
cumstances, demand was unnecessary.

The declaration was upon the consolidated money counts ;
of which only that for money had and received to plaintiff's
use can be claimed to be supported by the evidence.   There
can be no dispute as to how, of whom, and for what purpose
they received it.   They received it from Ades, who was in
possession and claiming the ownership of it, upon their
signing his appeal bond as sureties, to secure them against
loss by reason thereof.   When they had signed it the county
judge had no legal possession or control over it, nor could

plaintiff, pending the appeal, lawfully interfere with Ades' disposition of it.  When their liabilities as sureties were extinguished, without loss to them, by plaintiff's dismissal of the case, defendant's right to retain it as against Ades or his administrator, ceased.  But were they bound to deliver it to plaintiff, even upon a formal demand? They knew he had claimed it and sought to obtain it ·by the citation proceeding, but they also knew he had dismissed that proceedings after trial had and verdict announced against him. Were they bound, notwithstanding this, to concede his right and deliver it to him, at their peril, as against the party from whom they received possession, then and still claiming to own it?  A court of equity at their instance would doubtless have sustained a bill of interpleader, and required him first to establish his right on an issue with the adverse claimant.  But was it incumbent on them to file such a bill? He knew they did not pretend to own the money and all the other facts it would be necessary to state in such a bill.  He had commenced litigation for it against the adverse claimant, and being defeated in fact, sought a new trial in effect, by this action against appellees, and thus to impose upon them the burden of establishing his right in still another, at the suit of such claimant.

While this action is in form at law, it is upon a count "which in its spirit and objects has. been likened to a bill in equity." 2 Greenl. on Ev., Sec. 117.  We are inclined to the opinion that the evidence fails to support the count ; that defendants did not originally receive this money for the use of appellant; that their equitable liability was not changed by the dismissal of the citation proceeding, nor would have been by the additional fact, had it been a fact, that a formal demand was thereupon made of them by him; that they did not stand, as to him, in the shoes of Ades; and that in equity and good conscience they would not be bound to deliver it to appellant, under the circumstances of their possession, without the consent of Ades or a judgment in favor of appellant against him.

But however that may be, it is manifest from the special

finding that the jury determined the question of right, as between appellant and Ades, against appellant.

Upon the question there was but little, if any, material evidence except the testimony of Ades himself on the hearing before the County Court. As to what he there stated, the evidence was not entirely harmonious. None of the witnesses who heard him pretended to give his language. According to those introduced by appellant, it was, in substance, that she gave or delivered the packages to him, saying that she was getting in poor health and did not expect to live very long; that she wanted him to take it and at her death bury her, pay the funeral expenses and the balance was his. About an equal number for defendants stated it to have been, that one day when they were together in the house, she went and took them from behind some books in the book case, where she had kept them, and brought and handed them to him or laid them on his lap, saying she was old and feeble, her health was failing and she couldn't expect to live very long; that she had been his treasurer for many years and couldn't keep it any longer; "take it and keep it; it is yours; there is enough to keep us while we both live; when I die you will pay the funeral expenses, and there will be plenty left to take care of you as long as you live."

In the argument for appellant it is said that according to the version of two of appellees' witnesses it was a bailment, and that the weight of the evidence showed it was coupled with conditions. Neither of these views, however, appears to have been suggested on the trial, and neither is intimated in any of the instructions asked. It seems to have been conceded that the evidence showed a gift, and the only question was whether it was *inter vivos* or *causa mortis*, and valid as such. Appellant contended it was *causa mortis*, and that the donor, after making it, recovered her health and repossessed herself of the money; appellees, that it was absolute and that the donee retained its possession.

There was evidence that a few moments after the delivery to him, he either replaced the packages in the book case or

handed them to her to be so replaced and she did it. If the latter, it could hardly be understood as intended to be a return of them into her possession and care, which she had just relinquished for the reasons stated. We find no word of evidence in the record tending to show that she ever afterward touched or saw them, or claimed possession or control of them, and he testified that they continued to .be, without interruption, in his. Whether they remained in the same condition until her death, is an inquiry of no importance, though it is probable, from the amount produced on the hearing, that their passage from Kansas and some other expenses had been paid out of it, and also the $200 to appellant. There was nothing shown from which it could be inferred that any change in its condition was made by her, or that she was ever again in such possession as was adverse to or exclusive of him, or as she had before the alleged relinquishment and gift to him. Therefore there was no error in disallowing the offer to prove what she said, after that, about the possession.

Mr. Prentiss having testified to the statement of Mr. Ades of the property he took to the farm when he married Mrs. Marsh, counsel for appellant offered, in rebuttal, to prove by Mr. Dorothy that at that time he had no property. This was offered for the purpose of overcoming any presumption or inference that the money in question was in any part the proceeds, direct or indirect, of any such property. But the court refused to admit it, saying: "No, that was twenty-eight years ago. It isn't of enough importance to take up any time."

Appellant had brought out the statement by George Tunnicliff, his first witness, that Mr. Ades said he took to the farm some horses and some .live stock, but had at that time only about enough property to pay his debts. If it was material to show what property he then had, or to contradict this statement by showing that he had none, the proper time for it was before plaintiff closed his case in chief. But whether this would have been also proper in rebuttal or not, we think the court was right in holding the

question too unimportant to be gone into.  Appellee never pretended that there was any evidence tending to show how much of this money was previously his.  He claimed it all, by virtue of the alleged gift, and unless it is so established we find no evidence upon which the jury could properly award him any definite proportion or part of it.  The case was all in the question of such gift.  That of previous joint ownership could throw no light upon it, since it is clear that Ades never used the term as indicating the several interests. To the special interrogatory, whether the money was originally their joint property, the jury answered that they did not know.  We do not see that the exclusion of the evidence offered could have injured appellant.

Mr. Prentiss also testified to the statement by Ades that after the death of his wife appellant importuned him for the $500 and wanted him to make a will bequeathing the money to him.  It is said that this statement was introduced for the sole purpose of showing that appellant understood it was the money of Ades and that the court erred in refusing to allow appellant to contradict it or give his version of the matter.

Appellant had no personal knowledge of the facts.  His understanding or opinion of Ades' right must have been derived from information, and would be no evidence of the fact.  But besides, we think counsel is mistaken as to the action of the court.  The statement of Ades, as related by Prentiss, was not of a conversation, but of certain facts; that Marsh began to importune him and wanted $500 to use; that he told him he could let him have it and did so; that afterward Marsh suggested it was not safe to carry his money around that way; that he had better put it in the bank and make a will and will it to him; that he would like to have him do it.

The examination of Marsh in chief comprised only three questions: 1, whether he received from Ades $500 after his mother's death, which he answered affirmatively; 2, what did Ades say to him, if anything, at the time (which the court excluded); Ades made no statement as to that; and 3, whether

he requested Ades to will his money to him, which he denied. On cross-examination ·he admitted that he had told Ades it was not safe to carry the money around in that way, and advised him to· put it in the bank, and that in answer to a question by Ades whether he had better make such a will he had told him he had. Then on re-examination he was asked the single question, what other conversation had been had with Ades at that time, which the court excluded.

Thus it appears from the record, which we have examined on this point, that appellant was permitted, without objection, to answer the statement of fact made by Ades, and was only refused permission to state the conversation which Ades had not given. And his answers were not different from the statement of Ades, excepting the difference between advice and request to make the will, which is immaterial.

At the request of the plaintiff, the court gave the following instruction: "If Phœbe Ades, when sick, and not expecting to get well, gave the money in dispute in this case to her husband, and afterward recovered from said sickness and repossessed herself of said money, then such gift would be void;" and refused two others asked, of which one was simply a definition of a gift *causa mortis*, and the other declared it essential to the validity of such a gift that the donor shall die of the sickness or peril with which he or she is afflicted or threatened.

At the request of the defendants, two were given, of which one was that if the jury should find from the evidence that Mrs. Ades did own the money "and that she gave and delivered it to her husband before she died," then the plaintiff could not recover in this case; and the other added to the hypothesis of gift, as above stated, she "delivered the possession of it to him with the intention of then and there vesting in him the title and ownership of said money;" and the consequence was that the plaintiff could not recover without proof that Ades afterward gave it back and delivered it to her with a like intention.

The refusal of the plaintiff's two, referred to, and the giving

Marsh v. Prentiss.

of those asked for defendants are emphatically complained of. It is said that the latter not only ignore the plaintiff's theory of the case, but directly contradict the instruction given for him as above quoted.

We think the substance of plaintiff's refused instructions was contained in the one given, and in better practical form. The statement that such a gift as is therein described is called *donatio causa mortis*, could not aid the jury or the plaintiff.

Nor do we understand that those given for the defendants contradict the one given for plaintiff. They proceed upon a different and antagonistic hypothesis, and therefore must ignore the other; but there is no contradiction. City of Chicago v. Schmidt, 107 Ill. 191. That of plaintiff is a gift *causa mortis*, though it does not so name it. That of the defendants is a gift *inter vivos*, though they do not so name it. Chancellor Kent says: "There are two kinds of gifts: 1, gifts, *simply so called*, or gifts *inter vivos*, as they were distinguished in the civil law; 2, gifts *causa mortis*, or those made in the apprehension of death." 2 Kent's Comm., side p. 438. In defendants' instructions it is a gift, *simply so called*, which is a gift *inter vivos*. The distinction might have been more sharply and clearly drawn in each, and perhaps it would have been better, but as they stand there is no contradiction. We have already said that we find no evidence tending to show that Mrs. Ades ever repossessed herself of this money, as is assumed in the plaintiff's instruction, if that were necessary. Nor, we may now add, that she ever "recovered from said sickness," so as to avoid the gift therein mentioned. It does not indicate the particular form nor even the general character of her sickness, and it may be doubted whether her apprehension had a sufficiently definite reference to any particular cause, to make a gift in her condition a gift *causa mortis*. All that appears on that subject is that she was not well, and said her health was failing; she was growing old and feeble, and could not live, or expect to live, very long. This does not show a definite or special apprehension of death. But if it did, and what-

ever may have been the cause, the evidence is that she never entirely recovered. The testimony of Mrs. Lydia Ades, on cross-examination, is all that counsel refer to on this point. She was asked if, when they came back on the visit, in May, 1888, Mrs. Ades had not recovered her health. It does not appear that the witness knew just what it had been, so as to know whether she was or was not better, but she answered that she was able to sit up part of the time. Counsel then said interrogatively, "She was able to make the trip?" And the witness answered, "Well, in a sleeper." She further answered to leading questions, that she was able to ride around in a wagon, at times. She was then asked if she had not substantially recovered her health, and answered, yes, so as to be around most of the time. The impression clearly made by her testimony in the record is, that she was better at some times than at others, but never well or recovered. Sylvanus Ades testified that she never recovered—he thought she was never better than at the time of the gift, but rather grew gradually worse until she died. One of the indispensable requisites of a gift *causa mortis* is that the death of the donor must ensue without any perfect remission of the apprehended peril. Barnet v. The People, 25 App. 136, and authority there cited. In this case her death did so ensue. There was no perfect remission of the apprehended peril, whatever it was.

On either hypothesis as to the character of the gift, we think the evidence clearly warranted the finding, and the judgment will therefore be affirmed.